UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO PABLO,<br><br>            Petitioner,<br><br>    v.<br><br>MARTIN BITTER, Warden,<br><br>            Respondent.<br>_____/ | No. C-13-0627 EMC (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## I.   INTRODUCTION

Sergio Pablo, a state prisoner at Calipatria State Prison, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his 2009 conviction for robbery and carjacking. The petition is now ready for a decision on the merits. For the reasons discussed below, the petition is denied.

## II.   BACKGROUND

A.   The Crimes

The California Court of Appeal summarized the evidence of the crimes presented at a joint trial of Pablo and co-defendants Jorge Rico and Cesar Valle:

> On the evening of September 14, 2007, [victim] Gerardo was driving with his friends, [victims] Salvador, Miguel, and Juan. FN3  At about 9:20 p.m., Gerardo drove his burgundy Honda Accord into the parking lot of a night club called Mariano's. While his friends remained in the car, Gerardo approached Catherine Brown to talk to her. FN4  Juan then got in the driver's seat because the club was in an "ugly" neighborhood. Shortly thereafter, two men entered the back seat. One of them pulled out a gun, pointed it at Juan's head, and told him to drive. He also told the three men to give them their money or they would kill them. Juan handed them his wallet, and one of the men took about $600 in cash out of the wallet and threw the wallet on the

ground. Salvador gave them more than $1,000 in cash and a check. The check, which was made out to Samuel Vega, was for $400. Miguel, who was sitting in the front passenger seat, put his wallet containing $150 under the seat. The men directed Juan to drive to a nearby park, where they told the victims to get out. The three victims ran back to Mariano's.

> FN3. Gerardo, Salvador, Miguel, and Juan were identified only by their first names. Juan did not testify.
>
> FN4. Brown admitted that she had prior convictions for prostitution and possession of drugs for sale.

When Gerardo saw that his car was leaving, he called 911 to report that it had been stolen. Someone then grabbed his cell phone and hopped in a black Buick Rendezvous SUV. Brown heard someone saying "give us your wallets" in Spanish. She also saw two men from the black SUV, which had a dealer plate with a star on it, get into the Honda. When the Honda drove off, the SUV followed. Brown called 911 and tried to follow the Honda. However, she lost them within a block.

Sergeant Mark Lazzarini and his partner Officer Chris Balaoro responded to the broadcast of a stolen maroon Honda Accord at Mariano's. They had also been informed that the robbers were associated with a small, black SUV with a gold emblem or star. As Sergeant Lazzarini and Officer Balaoro drove towards the club, they saw a maroon Honda Accord and a small, black SUV, a Buick Rendezvous, which had a dealer license plate with a gold star. They followed the vehicles as they turned into the La Posada Apartment complex. La Posada Trece, a Sureno gang, originated in this complex.

Sergeant Lazzarini activated the lights on his patrol car, and the Honda pulled into a parking space. However, since the SUV accelerated to go south, Sergeant Lazzarini broadcast that it was fleeing. As Sergeant Lazzarini approached the Honda, Valle exited the vehicle. When he realized that Sergeant Lazzarini was a police officer, he took off running toward the area where the SUV had gone. Valle was wearing a black T-shirt with a picture of Bob Marley's face on it, gray shorts or pants, and brown gloves. Sergeant Lazzarini began chasing him.

When Sergeant Lazzarini rounded a corner, he saw Valle running towards the SUV. At that point, Pablo, who was wearing a light-colored T-shirt, exited the SUV, went into the trash enclosure of the apartment complex, and exited "a second" later. Pablo was then joined by Valle, and they both ran out of the apartment complex as Sergeant Lazzarini called for backup.

Meanwhile, the SUV had pulled into a parking spot. Sergeant Lazzarini told the occupants to show their hands, and three people exited the vehicle. Rico was the driver of the SUV, Quiroz was the right front passenger, and Alejandro Cisneros was the left rear passenger. After the men were arrested, $110 and a paycheck, which was made out to Samuel Vega, were found near the bumper of the SUV where Sergeant Lazzarini had seen one of the men appear to be setting something down. Officers found $1,200 in cash in the rear compartment of SUV. Sergeant Lazzarini also found a semiautomatic handgun in a dumpster in the trash enclosure into which Pablo had gone briefly. There was a wallet under the right front passenger seat of the SUV, and Quiroz had two $100 bills in his pocket.

Officers Omar Pena and Ian Parsons detained Valle and Pablo in a nearby field. Valle was no longer wearing brown gloves, which were found on the path that he had

1  taken. After searching the Honda, police found Miguel's wallet under the front passenger seat and over $400 in cash was found on the driver's seat.

3  *People v. Rico*, 2011 WL 5910073 at *1-2 (Cal. App. 6 Dist. 2011); Ex. 8.[1]

4  B.  Procedural History

At a joint jury trial in Monterey County Superior Court, Pablo was found guilty of multiple counts of kidnaping for robbery, kidnaping to facilitate carjacking, carjacking, second degree robbery and participation in a criminal street gang. Clerk's Transcript ("CT") at 905.1-905.29. It was also found that Pablo was armed with a firearm and committed the crimes for the benefit of a criminal street gang. *Id*. He was sentenced to 25 years to life in prison. CT at 1075.10-1075.15.

On November 28, 2011, the California Court of Appeal affirmed the judgment of conviction, but modified the sentence to an indeterminate term of life in prison and a determinate term of ten years for the enhancements and modified the judgment to reflect certain custody credits. *People v. Rico*, 2011 WL 5910073 at *26-28; Ex. 8. The California Supreme Court summarily denied Pablo's petition for review. Ex. 11. Pablo then filed this federal petition for writ of habeas corpus. The Court issued an order to show cause why the petition should not be granted. Respondent has filed an answer and Pablo filed a traverse.[2] The matter is ready for a decision on the merits.

### III.  STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

---

[1] All references herein to exhibits are to the exhibits submitted by respondent in support of the answer.

[2] Despite being filed late, the Court has reviewed and considered Pablo's traverse.

a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Delgado v. Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000). When confronted with such a decision, a federal court should conduct an independent review of the record to determine whether the state court's decision was an objectively unreasonable application of clearly established federal law. *Himes*, 336 F.3d at 853; *Delgado*, 223 F.3d at 982.

## IV. DISCUSSION

Pablo argues that: (1) his Sixth and Fourteenth Amendment rights to an impartial jury and a fair trial were violated due to juror misconduct and the trial court's denial of a motion for a new trial; (2) the trial court erred in denying his motion for an evidentiary hearing based on the juror misconduct and by not providing the confidential contact information for a juror; and (3) cumulative error. The Court will address each claim in turn.

A.    Juror Misconduct

Pablo argues that his right to an impartial jury was violated when the mother of one of the co-defendants told a juror that the co-defendant had spent the last ten years in jail and this was his last chance, and the jury was aware that the co-defendant had committed a prior crime because the prior strike had been mistakenly submitted to the jury during the trial.

1.    Legal Standard

The Sixth Amendment guarantees to the criminally accused a fair trial by a panel of impartial jurors. U.S. Const. amend. VI; *see Irvin v. Dowd*, 366 U.S. 717, 722 (1961). "Even if only one juror is unduly biased or prejudiced, the defendant is denied his constitutional right to an impartial jury." *Tinsley v. Borg*, 895 F.2d 520, 523-24 (9th Cir. 1990) (internal quotations omitted). The Ninth Circuit has recognized that to disqualify a juror for cause requires a showing of actual bias or implied bias, that is "bias in fact, or bias conclusively presumed as a matter of law." *United States v. Gonzalez*, 214 F.3d 1109, 1111-12 (9th Cir. 2000). However, the Constitution "does not require a new trial every time a juror has been placed in a potentially compromising situation." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote. *Id*. Due process only means a jury capable and willing to decide the case solely on the evidence before it and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. *Id*.

Clearly established federal law, as determined by the Supreme Court, does not require state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey v. Palmateer,* 341 F.3d 1037, 1045 (9th Cir. 2003); *see, e.g., Estrada v. Scribner*, 512 F.3d 1227, 1241 (9th Cir. 2008) (district court did not abuse its discretion in declining to hold hearing on juror bias where state court's determination was not unreasonable in finding two jurors were not actually biased, and that juror bias could not be presumed based on jurors' honesty during voir dire). *Remmer v United States*, 347 U.S. 227 (1954), and *Smith v. Phillips*, 455 U.S. 209 (1982), "do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the

trial court to question the jurors alleged to have bias. *Smith* states that this 'may' be the proper course, and that a hearing 'is sufficient' to satisfy due process." *Tracey*, 341 F.3d at 1044 (citing *Smith*, 455 U.S. at 217, 218). *Smith* leaves open the door as to whether a hearing is always required and what else may be "sufficient" to alleviate any due process concerns. *Id.*; *see, e.g., id*. at 1044-45 (concluding that state trial court's decision not to question juror further to obtain names of other jurors and to take additional testimony from them was not contrary, or an unreasonable application of, clearly established Supreme Court precedent).

A court confronted with a colorable claim of juror bias will generally conduct an investigation. *Davis v. Woodford*, 384 F.3d 628, 652-53 (9th Cir. 2004). Where there is no evidence that premature deliberations took place, however, or that jurors relied on extrinsic evidence, an investigation may not be necessary, especially if the judge provides an appropriate instruction. *Id*. (implicitly rejecting juror bias claim, where juror submitted note to judge before deliberations expressing skepticism about whether defendant would remain in prison if jury returned a noncapital sentence, and judge provided a detailed instruction that jurors should presume that state officials would properly perform their duties when executing the sentence but did not conduct an investigation).

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence presented at trial. *See Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965). Evidence not presented at trial is deemed "extrinsic." *See Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987). Jury exposure to extrinsic evidence deprives a defendant of the rights to confrontation, cross-examination and assistance of counsel embodied in the Sixth Amendment. *See Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).

"The presumption of prejudice that arises from juror misconduct, although strong, is not conclusive; 'the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.'" *Xiong v. Felker*, 681 F.3d 1067, 1076 (9th Cir. 2012) (quoting *Remmer v. United States*, 347 U.S. 227, 228–29 (1954)). A petitioner is entitled to habeas relief only if it can be established that the exposure to extrinsic evidence had "'substantial and injurious effect or influence in determining the jury's

verdict.'" *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). In other words, the error must result in "actual prejudice." *See Brecht*, 507 U.S. at 637.

The Ninth Circuit has identified several factors that are relevant in determining whether the alleged introduction of extrinsic evidence constitutes reversible error:

> (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of . . . whether the introduction of extrinsic material [substantially and injuriously] affected the verdict.

*Lawson*, 60 F.3d at 612 (quoting *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986), and incorporating *Brecht*). *See, e.g.*, *United States v. Saya*, 247 F.3d 929, 937-38 (9th Cir. 2001) (denial of motion for new trial not reversible error where several jurors learned that defendant's girlfriend had been killed while sitting beside defendant in a car several years earlier in a well-publicized killing; although the incident was mentioned in the jury room, the district court could not determine whether the jurors discussed it before or after the verdict was reached, the discussion was minimal, the foreperson immediately stated that such information was not to be considered in reaching a verdict, the shooting was not connected with the present crime, defense counsel already stated that the girlfriend was dead and had run a gambling house, and the case against the defendant was strong). The reviewing court should place great weight on the nature of the extrinsic evidence introduced, e.g., whether it related to a material issue in the case, *see Lawson*, 60 F.3d at 612, but not on the number of jurors affected by it, *see id.* at 613. Even a single juror's improperly influenced vote deprives the defendant of an unprejudiced, unanimous verdict. *See id.*

2. <u>Analysis</u>

The state court set forth the relevant background for this claim:

> On February 23, 2010, the day before sentencing, Pablo's trial counsel filed a motion for new trial in which he alleged juror misconduct and requested an evidentiary hearing and juror identification information. In his declaration in support of the motion, counsel stated that he had received two e-mails from the jury foreperson in November and December 2009. These e-mails stated that "during a break in the trial the juror went to the bathroom and while there the juror found a woman crying uncontrollably. The juror tried to console the woman by putting her arm around the

7

> woman. The juror told the foreperson that the woman communicated information about her son who was a defendant in the same trial with Sergio Pablo.... [¶] ... The woman was [co] defendant Jorge Rico's mother. Rico's mother communicated to the juror that Rico had spent the last 10 years in jail and this was his last chance. The foreperson indicated that the jury was aware that defendant Rico has strikes because the strike prior had been mistakenly submitted to the jury during the trial. The fact that the prior was for a deadly weapon charge hardened the jury against all the defendants according to the foreperson's email."
>
> At the hearing on the motion for new trial, defense counsel requested an evidentiary hearing and permission to contact the juror. The prosecutor responded that the request for an evidentiary hearing must "comply with [Code of Civil Procedure section] 237, and there's got to be prima facie evidence that it will be somehow important to a new trial. And I think based on the declarations [sic] we have, none of which are in affidavit form, all it basically says is that some information about a codefendant may have come into the jury. That information was also admitted at trial, basically. So I don't think there's anything alleged, even in the declaration by [defense counsel], that would give rise to a 237 showing to get the information of the juror." Defense counsel stated: "All I was trying to do at that point was to get to a point where I would have permission to contact her and go forward from there. [¶] The contact I have had was from the foreperson who related what happened." The trial court observed: "Frankly, based on what I've been provided, the Court doesn't think there's a reasonable basis to invade the privacy of a juror. Given the overwhelming nature of the evidence in this case, I can't imagine that even what is alleged to have occurred would have changed the outcome." The prosecutor then stated: "And just for the record, that evidence was basically put in through the gang expert in terms of contact of the codefendant Rico." The trial court agreed and denied the motion.

*Rico*, 2011 WL 5910073 at *19-20; Ex. 8.

The court of appeal then discussed the applicable state law and denied this claim:

> *In re Carpenter* (1995) 9 Cal.4th 634 (*Carpenter*) set forth a two-part test to evaluate claims of juror misconduct. "[W]hen misconduct involves the receipt of information from extraneous sources, the effect of such receipt is judged by a review of the entire record, and may be found to be nonprejudicial. The verdict will be set aside only if there appears a substantial likelihood of juror bias. Such bias can appear in two different ways. First, we will find bias if the extraneous material, judged objectively, is inherently and substantially likely to have influenced the juror. [Citations.] Second, we look to the nature of the misconduct and the surrounding circumstances to determine whether it is substantially likely the juror was actually biased against the defendant. [Citation.] The judgment must be set aside if the court finds prejudice under either test. [¶] The first of these tests is analogous to the general standard for harmless error analysis under California law. Under this standard, a finding of 'inherently' likely bias is required when, but only when, the extraneous information was so prejudicial in context that its erroneous introduction in the trial itself would have warranted reversal of the judgment. Application of this 'inherent prejudice' test obviously depends upon a review of the trial record to determine the prejudicial effect of the extraneous information. [¶] ... [However,] if it appears substantially likely that a juror is actually biased, we must set aside the verdict, no matter how convinced we might be that an unbiased jury would have reached the same verdict. [Citation.] A biased adjudicator is one of the few 'structural defects in the constitution of the trial mechanism, which defy analysis by "harmless-error" standards.' [Citations.] Thus,

even if the extraneous information was not so prejudicial, in and of itself, as to cause "inherent" bias under the first test, the totality of the circumstances surrounding the misconduct must still be examined to determine objectively whether a substantial likelihood of actual bias nonetheless arose. Under this second, or 'circumstantial,' test, the trial record is not a dispositive consideration, but neither is it irrelevant. All pertinent portions of the entire record, including the trial record, must be considered. 'The presumption of prejudice may be rebutted, inter alia, by a reviewing court's determination, upon examining the entire record, that there is no substantial likelihood that the complaining party suffered actual harm.' [Citation.] [¶] In an extraneous-information case, the 'entire record' logically bearing on a circumstantial finding of likely bias includes the nature of the juror's conduct, the circumstances under which the information was obtained, the instructions the jury received, the nature of the evidence and issues at trial, and the strength of the evidence against the defendant. For example, the stronger the evidence, the less likely it is that the extraneous information itself influenced the verdict. An example is provided in *Hasson v. Ford Motor Co.* [ (1982) ] 32 Cal.3d [388,] 417, where we found the presumption of prejudice had been rebutted, in part because '[t]here was overwhelming proof" in support of the verdict." (*Id*. at ¶. 653–654; *accord Nesler*, *supra*, 16 Cal.4th at ¶. 578–579.)

Here, the juror committed misconduct when she consoled the woman crying in the restroom, who told her that she was Rico's mother, that Rico had spent the last 10 years in jail, and that this was his "last chance." However, under either test, there was no substantial likelihood of prejudice to defendants. Viewed objectively, the information was not "inherently and substantially likely to have influenced the juror." (*Carpenter*, *supra*, 9 Cal.4th at p. 653.) Officer McKinley testified that Rico had been involved in 1998 in a "violent offense" in which Sureno gang slogans were yelled, and that he was then incarcerated until December 2006. The jury was also informed that Rico had previously been convicted of a felony listed in section 12021, subdivision (e). Thus, the jury learned about the "extraneous" material when it was properly admitted into evidence. The jury was also instructed that it should base its decision "only on the evidence that ha[d] been presented to [it] in this trial." For the same reasons, it was not "substantially likely that a juror [was] actually biased" by this information. (*Carpenter*, at p. 654.)

Defendants argue, however, that when the woman told the juror that it was Rico's "last chance," she effectively communicated that she expected him to be convicted. Since the evidence against defendants was overwhelming, there could have been no substantial likelihood of prejudice to defendants based on her belief that he would be convicted. Moreover, in our view, her crying and reference to his "last chance" was an appeal for sympathy, and the jury was instructed that it could not "let ... sympathy ... influence [its] decision." Thus, this reference cannot be deemed prejudicial. Accordingly, the trial court properly denied the motion for new trial on this ground.

Defendants next contend that the jury's receipt of information about Rico's prior strike conviction constituted juror misconduct and a presumption of prejudice.

This issue was considered in *People v. Gamache* (2010) 48 Cal.4th 347 (*Gamache*) in which court personnel provided the jury with a video tape that had never been entered into evidence. (*Id*. at p. 396.) *Gamache* first rejected the defendant's claim of structural error, stating: "Manifestly, the error here was trial error. The jury inadvertently had access to never-admitted evidence. This situation is no different than if the same evidence had been proffered at trial and a valid objection to its admittance was erroneously overruled. (*People v. Cooper* (1991) 53 Cal.3d 771, 836 ['The situation [where a jury innocently considers evidence it was inadvertently

given] is the same as any in which the court erroneously admits evidence.'].)  We meaningfully may ask whether, in light of all the other evidence properly admitted, the verdict this jury reached would have been the same absent exposure to the December 4 videotape." (*Gamache*, at ¶. 396–397.)  *Gamache* also rejected the defendant's argument of juror misconduct, reasoning: "We have consistently pardoned jurors for considering extrinsic evidence that finds its way into the jury room through party or court error.  In *People v. Cooper*, *supra*, 53 Cal.3d 771, a transcript never intended for the jury's eyes was inadvertently marked as an exhibit, admitted, and sent to the jury room.  The jury's consideration of the exhibit was only ordinary error: 'When, as in this case, a jury innocently considers evidence it was inadvertently given, there is no misconduct.' (*Id*. at p. 836.... [¶] In contrast, we have found juror misconduct where a juror actively or passively obtains information about a case from outside sources.  (E.g., ... *People v. Nesler*, *supra*, 16 Cal.4th at ¶. 579–580 [overhearing information about the case in a bar and revealing it to fellow jurors].)" (*Gamache*, at pp. 397–398.)

Though the jury might have committed misconduct by failing to inform the trial court that Rico's prior strike conviction had been submitted to the jury, defendants presented no evidence that the jury was aware during deliberations that the information was improperly before them.  As in *Gamache*, that the information was provided to the jurors suggested that "it was something they were supposed to have...." (*Gamache*, *supra*, 48 Cal.4th at p. 399 .)

Thus, we turn to the issue of prejudice.  Even if we assume that there was juror misconduct, there was no substantial likelihood of juror bias.  The jury was aware that Rico had been convicted of a felony and had been incarcerated for several years for this offense.  That the jury improperly learned that Rico's prior conviction involved firearm use was not unduly inflammatory given the evidence of firearm use by Rico's fellow gang members, and that the present case did not involve the firing of a firearm.  Thus, viewed objectively, the information was not "inherently and substantially likely to have influenced the juror." (*Carpenter*, *supra*, 9 Cal.4th at p. 653.)  We next examine the entire record to determine whether there was a substantial likelihood that a juror was actually biased. (*Id*. at p. 654.)  The evidence of Rico's tattoos, jail housing with Surenos, and photograph of him displaying gang signs established that Rico was an active gang member.  The evidence also established that Rico was a member of a gang whose primary activities included offenses involving the use of a firearm.  Moreover, the jury was instructed that it "must use only the evidence that was presented in this courtroom," that Rico's prior felony conviction was admitted solely to prove the section 12021 charge in count 15, and that it should "not consider this fact for any other purpose.  Do not speculate or discuss the nature of the conviction."  Based on this record, it was not substantially likely that a juror was actually biased by learning that Rico's prior conviction involved a deadly weapon.

Defendants also argue that the trial court violated their federal constitutional rights when it denied their motion for a new trial on the ground of juror misconduct.  A criminal defendant is entitled to an impartial jury in a state court under the United States Constitution.  (U.S. Const., 6th and 14th Amends.)  When the jury receives improper extraneous information, a criminal defendant "is entitled to a new trial if there is a reasonable possibility that the communication ... could have affected the verdict." (*United States v. Keating* (1998) 147 F.3d 895, 901.)  An appellate court's "inquiry is objective rather than subjective" and it "need not ascertain whether the extrinsic evidence *actually* influenced any specific juror. [Citation.] The government has the burden of showing beyond a reasonable doubt that extrinsic evidence did not contribute to the verdict. [Citation.]" (*Id*. at ¶. 901–902, italics added.)  As

10

previously discussed, there is no reasonable possibility that the information that Rico had previously served a prison term and that his prior strike conviction involved a deadly weapon could have contributed to the verdict.

*Rico*, 2011 WL 5910073 at *21-23; Ex. 8.

Pablo has failed to demonstrate that the state court denial of this claim is contrary to federal authority. The state court found that Pablo suffered no prejudice as a result of the information learned by the juror and he has failed to establish that the alleged exposure to extrinsic evidence had a substantial and injurious effect on the verdict.[3]

Pablo argues that the jury improperly learned that his co-defendant, Rico, had spent the last ten years in jail and the prior crime had been a weapons related offense, and this "hardened the jury against all of the defendants." Petition at 3. However, most of this information was properly admitted into evidence elsewhere at trial and known to the jury. A gang expert testified that Rico was incarcerated from 1998 to 2006 due to a gang-related offense. Reporter's Transcript ("RT") at 3187-88. It was stipulated to the jury that co-defendant Rico has previously been convicted of a felony listed in California Penal Code § 12021(e). RT at 3305.[4]

Also, Rico's mother's comments were not clearly a statement that she expected her son to be convicted in the case. Rather, as the state court noted, it was as likely an expression of her fear that he would be imprisoned for a long time if convicted.

Moreover, Pablo fails to sufficiently describe how it adversely affected the jury verdict against him, especially as the information related not to him, but a co-defendant. It is Pablo's burden to demonstrate a constitutional violation, and his conclusory allegations with no support are insufficient. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (emphasizing that "[c]onclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief.").

---

[3] The allegations of juror misconduct could not be confirmed and the information arose only from an e-mail from a juror to Pablo's attorney.

[4] The long list of possible offenses in § 12021(e) include murder, arson, robbery, rape, kidnaping, drug sales, discharge of a firearm, assault with a firearm or many other offenses. Cal. Penal Code, former § 12021(e) (2009). Although the jury was instructed with the stipulation, it is not clear if any list of offenses under § 12021(e) was provided with the jury instructions. It appears that the reference to the weapons charge arose from the jury being given an instruction to find that Rico had or had not been adjudicated in a juvenile court for assault with a firearm. CT at 936. This instruction was not completed by the jury. *Id*.

1    Furthermore, there was overwhelming evidence against the defendants presented to the jury
2 that found multiple defendants guilty of many counts after deliberating for only about a day. CT at
3 853-54. Pablo was observed by police fleeing the SUV that was involved in the carjacking and a
4 gun was recovered from an area where Pablo had run through after fleeing from police.

5    Finally, the jury was also properly instructed by the trial court. They were instructed to "use
6 only the evidence that was presented in this courtroom. Evidence is the sworn testimony of
7 witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence."
8 RT at 4327. With respect to the charge against co-defendant Rico for unlawfully possessing a
9 firearm, the jury was instructed that "the defendant and the People have stipulated or agreed that the
10 defendant was previously convicted of a felony. This stipulation means that you must accept this
11 fact as proved. Do not consider this fact for any other purpose. Do not speculate or discuss the
12 nature of the conviction." RT at 4360.[5] Accordingly, the juror who heard the extraneous
13 communication from Rico's mother was effectively instructed not to consider it.

14    Looking at the factors set forth by the Ninth Circuit in *Lawson* and *Bayramoglu*, petitioner is
15 not entitled to relief. Most importantly, much of the material in question was properly admitted into
16 evidence during trial. Due to the great deal of evidence against Pablo and the fact that the
17 extraneous material concerned his co-defendant and not him, Pablo cannot show that the material
18 had a substantial and injurious effect on the jury's verdict nor was it inherently likely to influence
19 the jury. While it is not known if all the material was actually received by the jury and to what
20 extent it was available and considered, the only material that was improperly before them was that
21 co-defendant Rico's prior crime had been a gun-related offense. But the jury was properly
22 instructed that Rico had a prior conviction and had been in prison for nearly ten years. Pablo has
23 failed to demonstrate actual prejudice from this error, and the state court denial of this claim was not

---

[5] Pablo also states that the information hardened the jury as to all of the defendants. However, a federal court reviewing a habeas claim of juror misconduct may consider juror testimony concerning whether the improper evidence was considered by the jurors, but may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence. *Sassounian v. Roe*, 230 F.3d 1097, 1108-09 (9th Cir. 2000); *see, e.g.*, *Estrada v. Scribner*, 512 F.3d 1227, 1237-1238 (9th Cir. 2008) (affirming district court's determination that it could not consider portions of jurors' affidavits proffered by petitioner pursuant to Fed. R. Evid. 606(b) because they addressed the subjective effect of evidence on particular jurors, but finding that district court could consider juror testimony about extrinsic evidence improperly brought to jury's attention).

1 an unreasonable application of *Smith v. Phillips*, 455 U.S. 209, 217 (1982) and *Irvin v. Dowd*, 366
2 U.S. 717, 722 (1961). Thus, this claim is denied.

B. <u>New Trial Motion</u>

Pablo next argues that the trial court erred in denying an evidentiary hearing and by not providing the confidential contact information for a juror.

In denying Pablo's claim regarding the jury contact information the California Court of Appeal stated:

> Defendants contend that the trial court abused its discretion when it denied the request for contact information relating to the juror who had conversed with Rico's mother and conveyed her remarks to another juror.
>
> When a defendant petitions the court for the release of a juror's personal identifying information, "[t]he petition shall be supported by a declaration that includes facts sufficient to establish good cause.... The court shall set the matter for hearing if the petition and supporting declaration establish a prima facie showing of good cause for the release of the personal juror identifying information, but shall not set the matter for hearing if there is a showing on the record of facts that establish a compelling interest against disclosure. A compelling interest includes, but is not limited to, protecting jurors from threats or danger of physical harm. If the court does not set the matter for hearing, the court shall by minute order set forth the reasons and make express findings either of a lack of a prima facie showing of good cause or the presence of a compelling interest against disclosure." (Code Civ. Proc, § 237, subd. (b).) "Denial of a petition filed pursuant to Code of Civil Procedure section 237 is reviewed under the deferential abuse of discretion standard." (*People v. Carrasco* (2008) 163 Cal.App.4th 978, 991 (*Carrasco*).)
>
> . . . .
>
> . . . [T]rial counsel's declaration did not show that further investigation was required for the trial court to rule on the motion. The trial court assumed that there was juror misconduct when the juror heard that Rico had spent the last 10 years in jail and communicated that information to the foreperson, and concluded that it was not "a reasonable basis to invade the privacy of a juror." Thus, after weighing the competing interests, the trial court did not abuse its discretion in denying the request for juror contact information.

*Rico*, 2011 WL 5910073 at *24 (footnote omitted); Ex. 8.

Regardless of whether the trial court erred in refusing to release juror information under state law rules, Pablo cites no United States Supreme Court authority recognizing a federal constitutional right to have jury information unsealed, particularly where it appears the information from the juror is not likely to be of constitutional significance. *See e.g., Yang v. McDonald*, 2012 WL 6738311 at *18 (E.D. Cal. 2012); *White v. Knowles*, 2011 WL 1196053 at *5 (N.D. Cal. 2011). Absent a

showing of a constitutional violation, habeas relief is not warranted. *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." (citations omitted)). Nor can Pablo transform a state law issue into a federal one merely by asserting a violation of due process. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996). For the same reasons why the juror misconduct did not give rise to a due process violation as discussed above, the failure to release juror information to investigate the same claim does not give rise to a due process claim.

Nor is Pablo entitled to habeas relief due to the trial court denying his request for an evidentiary hearing. As noted above, there is no clearly established federal law, as determined by the Supreme Court, that requires state or federal courts to hold a hearing every time a claim of juror bias is raised by the parties. *Tracey,* 341 F.3d at 1045. Again, the allegations of juror misconduct did not rise to a level to warrant a hearing in the trial court, as Pablo failed to show good cause for the release of the juror information. *See* Cal. Code Civ. Proc. § 237 (b). As there is no Supreme Court authority to support Pablo's allegations, this claim is denied.

C.     Cumulative Error

Pablo next argues that the cumulative effect of his prior claims denied him due process and he is therefore entitled to habeas relief.

1     Legal Standard

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that the conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution). Cumulative error is more likely to be found prejudicial when the government's case is weak. *See id.* However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632

14

F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error when there has not been more than one error.  *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012).

    2.    <u>Analysis</u>

Preliminarily, the Court notes that this claim has not been exhausted in state court. Nonetheless, federal courts may deny a petition filed by a state prisoner on the merits, "notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2).  This procedure should be utilized "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005).

The Court has found no errors let alone multiple constitutional errors that would warrant habeas relief.  The majority of information learned by the jury from outside sources was already properly admitted at trial and the extraneous material did not prejudice Pablo.  Nor was this a case where the government's case was weak as there was overwhelming evidence of Pablo's role in the crimes.  This claim based on asserted cumulative error is denied.

## V.    CONCLUSION

The petition for writ of habeas corpus is **DENIED** on the merits.

The federal rules governing habeas cases brought by state prisoners require a district court that enters a final order adverse to a petitioner to grant or deny a certificate of appealability ("COA") in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C. foll. § 2254.

A petitioner may not appeal a final order in a federal habeas corpus proceeding without first obtaining a COA.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues satisfy this standard. 28 U.S.C. § 2253(c)(3). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Although the Court has denied the petition, jurists of reason may find the result debatable or wrong with respect to the first claim of juror misconduct. Therefore, a COA is **GRANTED** solely to that claim. Petitioner is cautioned that the Court's ruling on the certificate of appealability does not relieve him of the obligation to file a timely notice of appeal if he wishes to appeal.

The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

Dated: May 12, 2014

EDWARD M. CHEN
United States District Judge

16